2025 IL App (1st) 242044

First District
Third Division
September 30, 2025

No. 1-24-2044

|  |  |  |
|---|---|---|
| LUZ RIVAS, Individually and as Representative of Decedent's Estate and Independent Administrator of the Estate of Angel Rivas, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 2024 L 0587 |
| BENNY'S PRIME CHOPHOUSE, LLC d/b/a Benny's Chophouse d/b/a Benny's Chophouse LLC, | ) ) ) | The Honorable Thomas M. Cushing, |
| Defendant-Appellant. | ) ) ) | Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Decedent Angel Rivas was employed as a busboy at a restaurant owned by defendant Benny's Prime Chophouse, LLC, when he died of anaphylactic shock after eating a meal provided by the restaurant which he was unaware contained seafood, to which he was allergic. Plaintiff Luz Rivas, the decedent's wife and the independent administrator of his estate, filed a lawsuit in the circuit court of Cook County, alleging that defendant was negligent in its food safety practices. After a bench trial, judgment was entered in her favor but, on appeal, the matter was reversed and remanded for a new trial based on the improper admission of evidence. After a new bench trial before a different judge, judgment was again entered in favor of plaintiff. Defendant now appeals, contending that (1) the trial court should have granted its motion for a directed finding, (2) the trial court made a number of errors concerning the admission of evidence and other trial matters, (3) the damages award was excessive, and

(4) the decedent was more than 50% at fault for his death. For the reasons set forth below, we affirm.

¶ 2                                   BACKGROUND

¶ 3                                *Decedent's Death*

¶ 4     The evidence at trial established the following. The decedent, who was originally from Ecuador before moving to the United States in the 1980s, was 43 years old at the time of his demise. While Spanish was his first language, according to plaintiff, he spoke "good English" and had no difficulty reading or understanding it. He and plaintiff had been married for approximately 20 years and had four children, ranging in age from 17 years to 4 months old; the oldest child had special needs and required around-the-clock care, which was provided by plaintiff. The decedent was generally in good health but was allergic to seafood. He informed plaintiff that if he ingested seafood, "[h]e gets red and [has] an allerg[ic] reaction." As a result, plaintiff never cooked seafood in the home, and she never observed the decedent eating seafood.

¶ 5     For almost 20 years, the decedent worked six days a week as a busboy during the dinner shift at a local steakhouse. During his time there, he befriended another employee, Alfonso Villegas, who worked as a manager. One day in 2009, Villegas brought ceviche to work and offered some to the decedent, who declined, informing Villegas that he was allergic. This was the only time throughout the years that they knew each other that the decedent had indicated that he was allergic to seafood.

¶ 6     In spring 2010, Villegas informed the decedent that he was planning on working as a line cook at a new restaurant—defendant's restaurant. The decedent, who had an infant child, decided to take a second job working the lunch shift at the restaurant to supplement his income.

The decedent began as a busboy at defendant's restaurant, which opened in April 2010, while Villegas worked as a line cook and "supervisor," assisting in translating for the Spanish-speaking kitchen staff and busboys.

¶ 7 The restaurant offered its employees an optional free "family meal," which was a staff-only meal made from leftover ingredients from that day's service. The meal was available to any staff members, after their shift had ended and they had clocked out. On April 5, 2010, Villegas and Juan Padilla, another line cook, prepared shrimp scampi as the family meal. Villegas observed the decedent in line for the meal and warned him that the meal contained seafood, so he should not eat it due to his allergy. As a result of Villegas' warning, the decedent did not eat the meal and instead ate a sandwich prepared for him by Villegas. Villegas testified that the decedent had not asked to be warned about the presence of seafood, but Villegas did so simply due to noticing him in line and happening to remember his allergy.

¶ 8 One week later, on April 12, 2010, the family meal again contained seafood—pasta with a lobster bisque sauce and chopped clams. Villegas and Padilla placed the food in a bowl for the employees to serve themselves and returned to their duties; there was no label on the bowl, and Villegas testified that the only way to tell what was in the meal was to taste it, but also added that the smell of the food would indicate that it contained seafood. Several minutes later, when Villegas passed by the area, he noticed the decedent standing in line for seconds and informed him that the meal contained seafood. While Villegas knew that the decedent had been working earlier that day, he had "no clue" whether the decedent was still present when the family meal was served.

¶ 9     Villegas asked the decedent if he needed Benadryl[1] and offered to take him to the hospital, but the decedent declined both. Instead, he washed his hands and rinsed out his mouth. Padilla overheard the conversation and asked the decedent why he had not informed anyone of his allergy, and he responded, "it's my own fault for not asking" whether the meal contained seafood. The decedent was discovered 5 to 10 minutes later in another room, where he had collapsed from anaphylactic shock. The decedent was taken to the hospital; plaintiff received a phone call at 2:45 p.m. informing her of the incident, and the decedent ultimately died at the hospital. An autopsy revealed that his cause of death was anaphylaxis due to ingestion of shellfish.

¶ 10                                    *Prior Litigation*

¶ 11     As a result of the decedent's death, plaintiff filed a workers' compensation claim, which was denied by defendant. She then filed a multicount lawsuit in the circuit court of Cook County (case no. 2012 L 003805) on April 10, 2012, alleging that defendant was negligent in its food safety practices and in its failure to warn the decedent of the presence of seafood in the family meal. She also subsequently filed an application for adjustment of claim, in the alternative, before the Workers' Compensation Commission (case no. 13 WC 009925). The circuit court case was stayed on May 12, 2015, pending resolution of plaintiff's workers' compensation claim. The case was removed from the stay calendar at plaintiff's request on November 8, 2017, and was renumbered (case no. 2017 L 11400). That case was voluntarily dismissed on September 11, 2019, and plaintiff refiled her complaint (case no. 2020 L 008455) on August 10, 2020.

---

[1] Villegas was not asked, not did he testify about, why he believed Benadryl would alleviate the decedent's potential allergic reaction. We note, however, that the medical examiner testified that Benadryl "is not the treatment of choice for anaphylaxis" and would not have saved the decedent's life alone.

¶ 12        During discovery, defendant deposed Barry Parsons, plaintiff's expert with respect to defendant's duties under the law. During the deposition, Parsons was asked about his knowledge of Illinois state or municipal statutes or ordinances concerning the preparation and service of food. He was unable to cite to any specific statutes or ordinances, but cited to federal authority—specifically, certain portions of the 2005 federal Food and Drug Administration Food Code[2] (FDA Food Code). At trial, however, Parsons cited to a different chapter of the FDA Food Code concerning the matter, which was permitted over defendant's objection. The trial court ultimately found in favor of plaintiff, with damages of approximately $8.2 million, which was reduced to approximately $4.5 million due to the trial court's finding that the decedent was 45% at fault.

¶ 13        Defendant appealed and a different panel of this court reversed, finding that Parsons should not have been permitted to testify about the undisclosed portions of the FDA Food Code. See *Rivas v. Benny's Prime Chophouse LLC*, 2023 IL App (1st) 221901-U. The matter was remanded to the circuit court for a new trial, and the case was renumbered (case no. 2024 L 0587) and assigned to a different judge on remand.

¶ 14                                *Instant Litigation*

¶ 15        On remand, plaintiff amended her complaint, and the operative complaint at trial consisted of three counts: (1) a survival action for negligence, (2) a wrongful death action for negligence, and (3) "judicial estoppel" as a bar to any argument concerning the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)). The negligence counts alleged, in essence, that

---

[2] We note that the FDA Food Code is not an enacted statutory scheme but is instead a model periodically published by the federal Food and Drug Administration, which "assists food control jurisdictions at all levels of government by providing them with a scientifically sound technical and legal basis for regulating the retail and food service segment of the industry." *FDA Food Code*, https://www.fda.gov/food/retail-food-protection/fda-food-code (last accessed Sept. 26, 2025).

defendant was negligent (1) in failing to prepare and serve food in a reasonably safe condition, (2) in failing to maintain adequate policies and protocols concerning food safety and allergies, and (3) in failing to warn employees—including the decedent—about the presence of seafood in the family meal or to prepare an alternate meal for those with allergies.

¶ 16    In response to plaintiff's complaint, defendant raised three affirmative defenses. Defendant first alleged that the decedent's level of contributory fault exceeded 50%, meaning that plaintiff was barred from recovery. Defendant also alleged that the decedent's failure to mitigate damages by accepting the offers of medical care immediately following his ingestion of the seafood "permitted the Plaintiff's damages to increase substantially," so defendant should not be liable for those damages. Finally, defendant alleged that the Workers' Compensation Act provided the exclusive remedy for plaintiff's claim.

¶ 17    Prior to trial, the parties filed several pretrial motions. As relevant to the instant appeal, plaintiff filed a motion to bar defendant from asserting its workers' compensation defense based on judicial estoppel or, in the alternative, to strike the defense. Plaintiff contended that the defense was inappropriate where defendant had continued to refuse to pay any workers' compensation benefits to the decedent's family and defendant's workers' compensation attorney had indicated that the decedent's death had not occurred in the course of his employment. Defendant, in turn, filed a motion to bar any argument that Villegas' knowledge of the decedent's allergy should be imputed to defendant, as it maintained that Villegas had learned that fact through a prior relationship with the decedent and such an argument would be both inappropriate and highly prejudicial. The trial court denied both motions but indicated that it would take the issues raised in plaintiff's motion with the case, and the matter proceeded to a bench trial.

¶ 18    During trial, Villegas was asked about his training and testified that his position as a line cook at defendant's restaurant was the first time he had ever worked as a cook. He had not been trained in any allergen policies or how to prevent any allergic incidents and was not aware of anyone at the restaurant who was a certified sanitation manager. Villegas testified that he did not communicate his knowledge of the decedent's allergy to anyone when working at the restaurant, as "I didn't know that I was supposed to communicate to anybody about it." Plaintiff's counsel asked, over defendant's objection, whether "the reason why you didn't communicate your knowledge about his allergy to the other people in the kitchen [was] because you were never trained about how to prevent allergen incidents," and Villegas confirmed that was true. Counsel later again asked, over defendant's objection, whether "[i]f you had knowledge about allergen training, what, if anything, would you have done about communicating to the other staff?" Villegas responded that "it would have been way different," specifying that "[w]e would have put a sign on the top of the food, top of the shelf." Finally, counsel asked, over defendant's objection, "[i]f there was a Chicago Board of Health rule that required labels of bulk food for self-service, what, if anything, would you have done to comply with that?" Villegas responded: "We would label the food and wouldn't be here."

¶ 19    Villegas also testified that family meals were commonly offered at restaurants. At the steakhouse where he previously worked, the family meal took the form of any lunch or dinner specials that the restaurant had failed to sell, which were placed on a cart for employees to eat. If an employee had an allergy, they would be given something else to eat.

¶ 20    Padilla similarly testified that, while he had worked as a cook at several restaurants since 1997, he had never received training in handling food allergies prior to the decedent's death.

He further testified that, in his experience, he had never seen anyone label the contents of a family meal.

¶ 21        The parties also presented the testimony of two experts concerning the duties of a restaurant with respect to food safety. Barry Parsons, plaintiff's food safety expert, testified that there was no formal allergen training at defendant's restaurant at the time of the decedent's death in 2010, and that any informal policy arose merely from the cooks' habits in making separate meals for specific individuals who they knew had allergies, which was wholly inadequate to ensure the safety of defendant's employees.

¶ 22        Parsons testified that the practice of serving the family meal by placing it in a bowl or pan for the employees to help themselves would be considered to be providing bulk food for self-service under the law. He further opined that, to a reasonable degree of food safety certainty, defendant's actions were not in compliance with industry standards and chapter 2 of the FDA Food Code. Parsons testified that defendant did not have a "person in charge," or certified food safety individual, as required by the FDA Food Code and by industry standards and that, if it had, the decedent's death could have been prevented. Parsons further testified that the industry standards for communication about allergens required either labeling of the food dishes or the presence of an attendant.

¶ 23        On cross-examination, Parsons admitted that Illinois had not adopted the FDA Food Code until 2017 but testified that portions of it, including the requirement for a person in charge, were adopted prior to that time through training materials and that industry standards also required training about food allergies. Parsons also admitted that defendant had an allergen policy in place for defendant's customers but testified that there was no such policy in place

8

for defendant's employees. Parsons testified that the FDA Food Code referred to "consumers" and that "[w]e're all consumers. *** You have to protect everybody."

¶ 24    Jeff Nelken, defendant's food safety expert, testified via an evidence deposition that, in 2010, there were "no established standards" concerning the exposure of either restaurant customers or employees to allergens. Nelken further testified that the procedures and policies used by defendant at the time "were very simple and very basic and were designed primarily for the guests that were coming into the restaurant." Nelken opined that, to a reasonable degree of certainty, "everyone did the appropriate actions to be taken," and that "[t]here isn't anything that they could have done that they didn't do," other than the decedent making his allergy known to his coworkers.

¶ 25    On cross-examination, Nelken admitted that there were food safety certifications available at the time and that the federal Food and Drug Administration had certain recommended standards, which he characterized as "suggestions," testifying that "[t]hese are not standards." Nelken further testified that the provision of the FDA Food Code which required labeling of bulk food for self-service did not apply to the situation in which a family meal was served to restaurant employees and applied to food manufacturing and food processing.

¶ 26    Finally, the parties stipulated that the decedent's medical bills totaled $8,553; his funeral expenses totaled $5,827; his lost wages were $23,446 per year; and the life expectancy of a 43-year-old man was an additional 38.1 years.

¶ 27    At the end of trial, defendant filed a motion for a directed finding with respect to its affirmative defense concerning the Workers' Compensation Act, contending that the statute provided the exclusive remedy for plaintiff's claim and that the complaint must therefore be dismissed in its entirety.

¶ 28        On September 30, 2024, the trial court entered a 15-page written order concerning the trial and defendant's motion for directed finding. First, the trial court found that plaintiff had met her burden of proving that defendant acted negligently, proximately causing the decedent's death. The trial court found that defendant's employee and agent, Villegas, was aware of the decedent's allergy but nevertheless served a meal containing seafood without informing anyone of the presence of seafood or displaying a label or card with such information. The trial court noted that displaying a sign would have been "a simple, inexpensive, effective way to prevent an allergic reaction and death" and was a technique recommended by industry authorities. The trial court found that "failure to follow that simple and virtually free precaution is failure to act reasonably under the circumstances, especially when balanced against the potential harm it would have addressed: a deadly anaphylactic reaction."

¶ 29        The trial court further found that having a person stationed near the serving bowl to warn of allergies would have been an acceptable alternative, as either approach would have informed the decedent of the allergen in the meal without needing to seek out Villegas. The trial court also found that Villegas' failure to inform anyone else of the decedent's allergy was unreasonable, since others were involved in the preparation of the family meal. The trial court observed that the decedent's death "illustrates the need for a more formal, intentional policy, such as labeling dishes with seafood or stationing a person at the serving line to advise employees. Relying on a busboy to determine who prepared the meal, locate that person, and ask about the ingredients was impractical and dangerous, especially in a new restaurant where most employees did not yet know each other."

¶ 30        The trial court noted that, while Villegas' knowledge of the decedent's allergy was undisputed, "that knowledge is not essential" for the finding of negligence. The trial court

found that "[t]he credible testimony of Mr. Parsons establishes a reasonable restaurant in 2010 should have labeled food being served in bulk, including this meal. That obligation was not dependent on any specific knowledge about an employee's allergy." Thus, the trial court found that Villegas' knowledge of the decedent's allergy and his conduct in setting out the meal without labeling it "fortifies the finding" of defendant's negligence. The trial court similarly found that the expert testimony "fortif[ied]" the conclusion that defendant was negligent, as both food experts testified that the restaurant industry, through its safety training arm, was aware of the need to have people trained in food safety present in restaurants.

¶ 31    The trial court also found "ample evidence in the record, direct and circumstantial, that the Defendant's negligence proximately caused [the decedent's] death." Specifically, the trial court pointed to the stipulation that the decedent died of anaphylaxis after consuming seafood, which was corroborated by medical testimony, and plaintiff's testimony that the decedent was careful to avoid seafood, which was corroborated by Villegas. The trial court found that "if notified the pasta contained seafood [the decedent] likely would have chosen not to eat it." Accordingly, the trial court found that plaintiff had satisfied its burden of establishing defendant's negligence.

¶ 32    The trial court next found that defendant had satisfied its burden of establishing its affirmative defense of contributory negligence, as the evidence demonstrated that the decedent's negligence was a proximate cause of his injuries. The trial court found that "[a] reasonable person with an allergy to seafood would determine whether food he planned to eat contained seafood before eating." The trial court pointed to Padilla's testimony, which "succinctly stated" that the decedent's death could have been avoided if defendant had identified the food as seafood or if the decedent had investigated the meal's contents before he

ate. The trial court, however, nevertheless found that "[t]he fact remains, [defendant] was a member of an industry that knew the importance of having a system in place to prevent accidental ingestion and death. The risk was enhanced in this instance by the fact that there was no seafood visible in the meal." After finding that the decedent's "relatively benign reaction to prior exposure to seafood is a mitigating factor, albeit a minor one, on the issue of his own responsibility for his injuries and death," the trial court determined that the percentage of negligence attributable to the decedent was 40%.

¶ 33    With respect to defendant's affirmative defense concerning failure to mitigate damages, the trial court found that defendant had not made any argument or presented any evidence concerning the defense, so there was no evidence that the decedent's failure to seek immediate medical care was a proximate cause of any of his injuries.

¶ 34    Finally, the trial court addressed the applicability of the Workers' Compensation Act. The trial court first found that the count in plaintiff's complaint seeking to bar defendant's argument based on estoppel failed to state a cause of action and accordingly struck that count of the complaint. Next, the trial court denied defendant's motion for directed finding and further found that defendant had not satisfied its burden of proof as to its affirmative defense.

¶ 35    The trial court found that the decedent's injury and death did not arise out of his employment, nor did it occur in the course of his employment. The trial court observed that the meal was optional, was served after the employees had finished their work and had clocked out, and was not part of employee compensation. The trial court also found that nothing about the decedent's employment exposed him to a greater risk than a member of the public, as the risk of injury from consuming seafood was personal to him. Accordingly, the trial court found that defendant had failed to meet its burden to prove its affirmative defense by a preponderance

of the evidence and further found that "[i]t follows that the defendant's motion for directed finding also must be denied."

¶ 36    The trial court also briefly addressed plaintiff's contention that defendant was estopped from raising its argument due to the position it had taken in the workers' compensation proceedings, finding that it was "unpersuaded" by defendant's suggestion that "the denial of the workers' compensation claim was an insurer's tactic the court should disregard." The trial court found that defendant rejected the workers' compensation claim, denying the injuries arose out of or in the course of employment, and had obtained a benefit by not paying any benefits to date. The trial court found that this "further support[s] this court's finding that defendant has failed to meet its burden on its Third Affirmative Defense. In the alternative, the court finds the evidence proves the inapplicability of the exclusive remedy provisions of" the Workers' Compensation Act.

¶ 37    The trial court then calculated the damages award, finding in favor of plaintiff in the amount of $8,064,380, which consisted of itemized damages for (1) lost money, benefits, goods, and services ($314,380); (2) pain and suffering ($250,000); (3) grief and sorrow ($3.2 million); and (4) loss of society, which was further itemized for plaintiff ($300,000) and each of the decedent's four children ($1 million each). After reducing the total damages by the percentage of the decedent's contributory negligence, the trial court awarded plaintiff a total of $4,838,628 plus costs and prejudgment interest.

¶ 38    Plaintiff subsequently filed a motion for costs and prejudgment interest, contending that she was entitled to costs of $389.31 for filing fees and $943,332.54 in prejudgment interest. Defendant objected to the request for prejudgment interest, claiming that the statute providing for prejudgment interest was unconstitutional. On October 24, 2024, the trial court amended

13

its judgment order, awarding plaintiff the costs and prejudgment interest she had sought, resulting in a total judgment amount of $5,782,349.85. This appeal follows.

¶ 39                                        ANALYSIS

¶ 40        On appeal, defendant contends that (1) the trial court should have granted its motion for a directed finding based on its affirmative defense concerning the Workers' Compensation Act, (2) the trial court made a number of errors concerning the admission of evidence and other trial matters, (3) the damages award was excessive, and (4) the decedent was more than 50% at fault for his death. We consider each argument in turn.

¶ 41                              *Workers' Compensation Act*

¶ 42        Defendant first contends that the trial court erred in denying its motion for a directed finding on its affirmative defense concerning the Workers' Compensation Act. As an initial matter, plaintiff contends that defendant has waived this argument by not filing its motion for a directed finding at the close of plaintiff's case. Section 2-1110 of the Code of Civil Procedure (Code) provides that, in a bench trial, "at the close of plaintiff's case," the defendant may move for a finding in its favor. 735 ILCS 5/2-1110 (West 2022). If the trial court denies the motion and the defendant proceeds to submit evidence in support of its defense, "the motion is waived." *Id.*; see *Pancoe v. Singh*, 376 Ill. App. 3d 900, 909 (2007). Plaintiff claims that, since defendant's motion was presented at the close of *all* the evidence, not at the close of plaintiff's case, defendant has waived its motion.

¶ 43        In this case, defendant presented the live testimony of only one witness, Padilla, as its expert's testimony was presented via an evidence deposition. By agreement of the parties, Padilla was called out of order, testifying while plaintiff was still presenting her case in chief. At the close of plaintiff's case, then, all live testimony had concluded, and the only remaining

14

part of the case was two exhibits submitted by defendant—one consisting of the evidence deposition and one consisting of plaintiff's application before the Workers' Compensation Commission—both of which were admitted without objection. The trial court asked defense counsel whether the defense rested, and counsel indicated that it did, but then "backpedal[ed] a bit," indicating that "I do have the motion that we've discussed. I have it now. I can present it to the Court. Your Honor indicated that he was going to give Counsel a couple days to file a response brief." Copies of a motion for directed finding, as well as plaintiff's response to the motion, are contained in the record on appeal.

¶ 44        Based on the facts of this case, we cannot find that defendant waived its motion for a directed finding. The witnesses were called out of order by agreement, meaning that it would not have been possible for defendant to present its motion prior to submitting any evidence in its own case. There was also no objection by plaintiff to defendant's motion, nor did the trial court raise any concerns, and the record suggests that the parties contemplated defendant filing such a motion. Thus, we find defendant's motion properly before us on appeal.

¶ 45        In ruling on a motion for a directed finding, the trial court engages in a two-prong analysis. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). First, the trial court determines, as a matter of law, whether the plaintiff has presented a *prima facie* case by proffering some evidence on every element essential to the cause of action. *Id.* If so, then the trial court proceeds to the second prong, which requires the trial court to weigh the evidence, including determining the credibility of the witnesses, and drawing reasonable inferences therefrom. *Id.* at 275-76; see 735 ILCS 5/2-1110 (West 2022). If, after doing so, there remains sufficient evidence to establish the plaintiff's *prima facie* case, the motion should be denied. *Cryns*, 203 Ill. 2d at 276. If, however, the evidence warrants a finding in the defendant's favor, the motion should

be granted and the trial court should enter a judgment dismissing the action. *Id.* Where the trial court rules on the motion under the first prong, it constitutes a question of law and is reviewed *de novo*. *Id.* at 275. Where, however, the trial court rules on the motion under the second prong, the trial court's findings will not be reversed unless they are contrary to the manifest weight of the evidence. *Id.* at 276.

¶ 46    In this case, the trial court's approach in ruling on defendant's motion for a directed finding was unusual. Instead of the typical situation in which a defendant's motion for a directed finding is ruled on immediately upon the close of the plaintiff's case, here, the trial court ruled on the motion at the same time as it ruled on the merits of the entire case. Indeed, in its analysis, the trial court considered the merits of defendant's affirmative defense based on all of the trial evidence, then found that "[i]t follows that the defendant's motion for directed finding also must be denied." We observe, however, that in ruling on a motion for a directed finding, the trial court is limited to considering only the evidence presented by the plaintiff and, therefore, the trial court here should not have considered the out-of-order testimony presented by defendant or the exhibits it later offered into evidence. See *Friedman v. Safe Security Services, Inc.*, 328 Ill. App. 3d 37, 50 (2002); *Century National Insurance Co. v. Tracy*, 316 Ill. App. 3d 639, 645 (2000). While not urged by defendant in this case, the consideration of a defendant's out-of-order evidence in ruling on a motion for directed finding has been found to be reversible error in other circumstances. See *Century National Insurance*, 316 Ill. App. 3d at 645-46 (reversing a grant of the defendants' motion for directed finding where the trial court considered the testimony of the defendants' witness).

¶ 47    Here, we cannot find that the trial court's atypical approach was problematic under the circumstances of this case, primarily due to the fact that the trial court rejected the affirmative

16

defense on its merits. The trial court's ruling on the merits of a defendant's affirmative defense generally encompasses more evidence than its ruling on a motion for a directed finding as, by definition, the motion for a directed finding occurs before the defendant has presented its case in chief. See 735 ILCS 5/2-1110 (West 2022). Thus, if the trial court finds that a defendant has failed to prove its affirmative defense even after considering the defendant's evidence, it necessarily follows that the trial court would reach the same result when considering only the plaintiff's evidence in the context of a motion for directed finding. In other words, if the trial court properly found that defendant had failed to establish its affirmative defense on its merits, its denial of the motion for directed finding would also be proper. Consequently, we proceed to review the propriety of the trial court's ruling on the merits of defendant's affirmative defense in light of all of the evidence presented at trial.

¶ 48    In reviewing a trial court's judgment after a bench trial, we defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. A factual finding is against the manifest weight of the evidence " 'when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence.' "[3] *Id.* (quoting *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007)).

¶ 49    In its affirmative defense, defendant contended that plaintiff's civil action was barred by the Workers' Compensation Act (Act). The Act "provides the exclusive remedy for employees to recover from their employers following accidental workplace injuries." *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 464 (2010); see 820 ILCS 305/5(a), 11 (West 2010). The

---

[3] As noted, a ruling on a motion for directed finding based on the second prong is also reviewed under a manifest weight of the evidence standard. See *Cryns*, 203 Ill. 2d at 276. Thus, the only difference in the analysis of the two rulings is whether the evidence presented during defendant's case in chief is considered.

statute bars an employee from bringing a common-law cause of action against his employer unless the employee proves (1) that the injury was not accidental, (2) that the injury did not arise out of his employment, (3) that the injury was not received during the course of employment, or (4) that the injury was not compensable under the Act. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 463 (1990). In this case, defendant's claims center around the second and third exceptions.

¶ 50    The questions of whether an individual's injuries arose out of and occurred in the course of employment are generally questions of fact, which rely on an assessment of the testimony and evidence presented by the parties. *Tazewell County v. Illinois Workers' Compensation Comm'n*, 2025 IL App (4th) 230754WC, ¶ 22. As such, we review the factfinder's determination under a manifest-weight-of-the-evidence standard. *Id.* In doing so, the test "is not whether the reviewing court or any other tribunal might reach the opposite conclusion on the same evidence, but whether there was sufficient factual evidence in the record to support" the decision. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982). Accordingly, we proceed to consider whether there was sufficient factual evidence to support the trial court's determinations on the applicability of either exception.

¶ 51                              Arising Out of Employment

¶ 52    Defendant first claims that plaintiff was barred from pursuing a civil action where the decedent's injury arose out of his employment. The requirement that an injury "arise out of" an employee's employment " 'is primarily concerned with causal connection.' " *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 36 (quoting *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003)). " 'To satisfy this requirement it must be shown that the injury had its origin in some risk connected with, or incidental to, the

employment so as to create a causal connection between the employment and the accidental injury.' " *Id.* (quoting *Sisbro*, 207 Ill. 2d at 203). A risk is "incidental to the employment" when "it belongs to or is connected with what the employee has to do in fulfilling his or her job duties." *Id.* (citing *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45 (1987)).

¶ 53     Our supreme court has identified three categories into which an employee's risk may fall: " '(1) risks distinctly associated with the employment; (2) risks personal to the employee; and (3) neutral risks which have no particular employment or personal characteristics.' " *Id.* ¶ 38 (quoting *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 162 (2000)). The first category of risks includes the "obvious" types of work-related injury, such as tripping on a defect on the employer's premises or performing a work-related task which contributes to the risk of falling, and are deemed to arise out of the employee's employment. *Id.* ¶ 40. The second category of risks " 'include nonoccupational diseases, injuries caused by personal infirmities such as a trick knee, and injuries caused by personal enemies and are generally noncompensable.' " *Id.* ¶ 42 (quoting *Illinois Institute of Technology Research Institute*, 314 Ill. App. 3d at 162-63). An exception, however, applies where "the work place conditions significantly contribute to the injury or expose the employee to an added or increased risk of injury.' " *Id.* (quoting *Rodin v. Industrial Comm'n*, 316 Ill. App. 3d 1224, 1229 (2000)). Finally, the third category of risks includes injuries such as " 'stray bullets, dog bites, lunatic attacks, lightning strikes, bombing, and hurricanes.' " *Id.* ¶ 44 (quoting *Illinois Institute of Technology Research Institute*, 314 Ill. App. 3d at 163). Injuries caused by neutral risks generally do not arise out of employment unless the employee was exposed to the risk to a greater degree than the general public. *Id.* " 'Such an increased risk may be either qualitative, such as some aspect of the employment which contributes to the risk, or quantitative, such as

when the employee is exposed to a common risk more frequently than the general public.' " *Id.* (quoting *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014 (2011)).

¶ 54     In this case, the trial court identified the "risk" to which the decedent was exposed to be the "risk of injury due to consumption of seafood." As such, it classified the risk as a personal risk or, "at best[,] a neutral risk" and found that the decedent's injuries did not arise out of his employment. We cannot find that this determination was against the manifest weight of the evidence. See *id.* ¶ 30 (the question of whether an injury arises out of an employee's employment typically presents a question of fact).

¶ 55     The only case cited by the trial court, identified by the parties, or discovered in our own research which concerns an employee's allergic reaction is *Rodin*, 316 Ill. App. 3d 1224. In that case, an employee of a subcontractor was directed by his employer to attend a lunch hosted by the general contractor as a representative of the subcontractor. *Id.* at 1225. During the lunch, the employee ate something which later triggered an allergic reaction, sending him to the hospital. *Id.* at 1226. The employee was denied workers' compensation benefits due to the finding that the injury did not arise out of his employment and, on review, the appellate court agreed. *Id.* at 1227.

¶ 56     In categorizing the type of risk, the *Rodin* court found that "[t]he risk of an allergic reaction to wholesome food was not a risk inherent in the claimant's employment as a foreman of an electrical contractor. Consequently, the risk is not an employment risk or one distinctly associated with his employment." *Id.* at 1228-29. The *Rodin* court further found that "[n]either can it be said that it is totally neutral or void of personal characteristics. In this case, the risk to which the claimant was exposed was one personal to him." *Id.* at 1229. The appellate court

20

noted that, where the risk was a personal one, the question of whether it arose out of the employee's employment was determined by "whether he was exposed to a risk greater than that to which the general public is exposed." *Id.*

¶ 57     The *Rodin* court observed that nothing suggested that the food which caused the allergic reaction was unfit for consumption or posed any risk to the general public. *Id.* Instead, the court found that "[t]he risk that the claimant might have an allergic reaction to food containing preservatives is unrelated to his employment and is a risk to which he would have been equally exposed apart from his work." *Id.* As such, the injury was not compensable. *Id.* The *Rodin* court further observed that "[t]he fact that the claimant would not have consumed the food which caused his reaction had he not been ordered to attend the *** luncheon does not, standing alone, mandate a finding that his allergic reaction arose out of his employment, as Illinois has never adopted the positional risk doctrine." *Id.*

¶ 58     Based on the reasoning in *Rodin*, we cannot find that it was against the manifest weight of the evidence for the trial court in this case to have found that the decedent's injury did not arise out of his employment at the restaurant. As in *Rodin*, the risk of an allergic reaction from eating otherwise untainted food was a risk which was personal to the decedent and was not inherent in his duties as a busboy. The decedent's job duties required clearing tables and setting them in preparation for customers; he was not required to sample or otherwise eat the food served by the restaurant. To the extent that he did eat the food, the food which was served as part of the family meal was from the same inventory which was served to the customers—indeed, the family meal was primarily composed of leftover food from the service. Thus, the decedent was not exposed to any greater risk than the general public by virtue of his employment.

Accordingly, the trial court's determination that the decedent's injury did not arise out of his employment was not against the manifest weight of the evidence.

¶ 59     We do not find persuasive defendant's contention that the "risk" at issue was "serving unlabeled food without warning employees." This argument conflates the alleged *negligent conduct* with the risk of injury. Defendant, however, cites no authority for the proposition that the risk to which an employee is exposed must be the result of negligence. To the contrary, in order to effectuate the purpose of the Act—to provide financial protection to workers for accidental injuries—the Act imposes liability on an employer without fault. *Meerbrey*, 139 Ill. 2d at 462. There is no requirement in the Act that a compensable injury must result from an employment-related risk caused by the employer's negligence, and there are countless cases in which an employee is injured in a manner which is not the result of any wrongdoing on the part of his employer. We also observe that, in this case, if the decedent had not been allergic to seafood, "serving unlabeled food without warning employees" would not have caused him any injury whatsoever. The risk to which he was exposed was the risk of eating a food to which he was allergic—a risk which, as we have explained, was one wholly personal to him and one to which he would have been equally exposed apart from his work.

¶ 60                              Course of Employment

¶ 61     Defendant also claims that plaintiff was barred from pursuing a civil action where the decedent's injury occurred during the course of his employment. The requirement that injury occur "in the course of" the employee's employment "refers to the time, place, and circumstances of the injury." *McAllister*, 2020 IL 124848, ¶ 34 (citing *Scheffler Greenhouses, Inc. v. Industrial Comm'n*, 66 Ill. 2d 361, 366-67 (1977)). " 'A compensable injury occurs 'in the course of' employment when it is sustained while a claimant is at work or while he performs

reasonable activities in conjunction with his employment.' " *Id.* (quoting *Wise v. Industrial Comm'n*, 54 Ill. 2d 138, 142 (1973)).

¶ 62     If an injury occurs "within the time period of employment, at a place where the employee can reasonably be expected to be in the performance of his duties and while he is performing those duties or doing something incidental thereto," the injury is deemed to have occurred in the course of employment. *Eagle Discount Supermarket v. Industrial Comm'n*, 82 Ill. 2d 331, 338 (1980) (citing *Segler v. Industrial Comm'n*, 81 Ill. 2d 125, 128 (1980). Our supreme court has extended this rule to include injuries sustained during an employee's lunch break while still on the employer's premises, reasoning that the act of procuring lunch is reasonably incidental to the employment. *Id.* at 339; see *County of Cook v. Illinois Industrial Comm'n*, 165 Ill. App. 3d 1005, 1008 (1988).

¶ 63     In this case, the trial court found that the decedent's injury did not occur during the course of his employment, as the decedent had completed his work for the day and was eating an optional meal provided by defendant. We cannot find that this determination was against the manifest weight of the evidence. See *Wise*, 54 Ill. 2d at 142 (the questions of whether an injury arises out of and in the course of an employee's employment are typically questions of fact).

¶ 64     While defendant attempts to analogize the instant case to the "lunch hour" cases, we cannot find that this case involves the same type of situation. In "lunch hour" cases, our supreme court has indicated that "the most critical factor in determining whether the accident arose out of and in the course of employment is the location of the occurrence." *Eagle Discount*, 82 Ill. 2d at 339. Thus, where the employee sustains an injury on a lunch break while on the employer's premises, "the act of procuring lunch has been held to be reasonably incidental to the employment." *Id.* In addition, our supreme court has explained that eating is deemed to be an

act of personal comfort, so the "personal comfort" doctrine applies to lunchtime injuries. *Id.* Under that doctrine, "the course of employment is not considered broken by certain acts relating to the personal comfort of the employee." *Id.* In other words, in finding that lunchtime injuries may occur in the course of employment, our supreme court has focused on (1) the place of the injury and (2) the type of action causing the injury. Under either theory, the employee is considered to be engaged in a continuous course of employment which is not broken by a brief respite to eat or engage in certain other activities.

¶ 65    Here, by contrast, the decedent's "course of employment" had ended for the day—his shift was over, and he had clocked out. While defendant suggests that the family meal was still considered to be in the course of the decedent's employment since defendant was aware of the provision of the meal, defendant fails to cite any authority finding such a result *where the employee's shift had ended*. *Eagle Discount* certainly does not stand for such a proposition, as under either the "lunch hour" or "personal comfort" doctrine, the injury occurs during a "break" during the workday. See *id*. at 339-40. While we recognize that, for instance, walking through a parking lot before or after the shift may be considered to be in the course of employment (see, *e.g.*, *Dodson v. Industrial Comm'n*, 308 Ill. App. 3d 572, 575 (1999)), defendant has not cited any authority providing that voluntarily remaining on the premises after the end of an employee's shift to take advantage of an optional meal provided by the employer may be interpreted the same way. We therefore cannot find that it was against the manifest weight of the evidence for the trial court to have determined that the decedent's injury did not occur in the course of his employment.

¶ 66                                    Judicial Estoppel

¶ 67        As a final matter with respect to defendant's affirmative defense, defendant contends that the trial court erred in finding that defendant was judicially estopped from arguing that the Act barred the civil action. In her complaint, plaintiff had included a count alleging that defendant should be judicially estopped from relying on the Act, based on the representations of defendant's workers' compensation counsel. In its order following trial, the trial court struck that count of the complaint for failure to state a cause of action. The trial court nevertheless addressed the issue, as plaintiff had also raised it in a pretrial motion *in limine*, agreeing with plaintiff that defendant had taken a position as to the applicability of the Act during the workers' compensation proceedings which was inconsistent with the position it was taking during the civil action and that defendant received a benefit from that position. Specifically, the trial court observed that defendant had rejected plaintiff's workers' compensation claim, denying that the injuries arose out of or occurred in the course of employment, and had obtained a benefit by not paying any benefits under the Act. The trial court found that this "further support[s] this court's finding that defendant has failed to meet its burden on its Third Affirmative Defense. In the alternative, the court finds the evidence proves the inapplicability of the exclusive remedy provisions of" the Workers' Compensation Act.

¶ 68        As noted, we have determined that it was not against the manifest weight of the evidence for the trial court to find that the decedent's injury did not arise out of or occur in the course of his employment. These findings were made after thoroughly considering defendant's evidence and arguments. Thus, even if the trial court's statements could be interpreted as a finding that judicial estoppel applied, the trial court nevertheless considered the defendant's defense in full—exactly as defendant wished—and its findings were amply supported by the

evidence. Accordingly, we have no need to further consider defendant's arguments concerning the applicability of judicial estoppel in this case.

¶ 69                                            *Trial Errors*

¶ 70        The next set of issues raised by defendant on appeal all concern alleged errors made during trial. Specifically, defendant contends that the trial court erred by (1) imputing Villegas' knowledge of the decedent's allergy to defendant, (2) allowing witnesses to testify to speculative potential conduct, and (3) admitting an "incomplete, inapplicable, and prejudicial" portion of the FDA Food Code into evidence.

¶ 71                                       Villegas' Knowledge

¶ 72        Defendant first claims that the trial court erred by imputing Villegas' knowledge of the decedent's allergy to defendant. A company such as defendant is an artificial legal entity, and the only knowledge which it can be said to have is that which is imputed to it under the principles of agency law. *Campen v. Executive House Hotel, Inc.*, 105 Ill. App. 3d 576, 585-86 (1982); see *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589 (2009) (generally, the knowledge of an agent is imputed to his principal). "Thus, knowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agency's authority." *Campen*, 105 Ill. App. 3d at 586 (citing *United Disposal & Recovery Co. v. Industrial Comm'n*, 291 Ill. 480, 485 (1920)).

¶ 73        In this case, defendant does not dispute that Villegas was defendant's agent, and does not dispute that Villegas was aware of the decedent's allergy.[4] Instead, defendant claims that, since

---

[4] We observe that, for these purposes, it is irrelevant whether Villegas acted in a supervisory capacity with respect to the decedent, as knowledge held by coworkers about another coworker is still imputed to the employer. See *Bryant v. Livigni*, 250 Ill. App. 3d 303, 309 (1993) ("[W]hether the agent

the source of that knowledge was a preexisting relationship, it was not "receive[d] while acting within the scope of his or her agency" (*id.*) and therefore could not properly be imputed to defendant. We do not find this argument persuasive.

¶ 74    Knowledge which was gained prior to employment may be imputed to an employer under certain circumstances, "for instance, where it is clear that the information or knowledge obtained by the employee at a prior time is so precise and definite that it must be present in the employee's mind at a later time." *Carrizales v. Rheem Manufacturing Co.*, 226 Ill. App. 3d 20, 45-46 (1991); see *Greer v. Carter Oil Co.*, 373 Ill. 168, 172 (1940). In this case, the record clearly establishes that the fact of the decedent's allergy was "so precise and definite" (*Carrizales*, 226 Ill. App. 3d at 46) that it was present in Villegas' mind even after beginning his employment at defendant's restaurant. Only a few days after the restaurant opened, Villegas independently recalled the decedent's allergy when serving the family meal containing shrimp scampi. In addition, on the day of the decedent's allergic reaction, Villegas immediately reacted to the decedent's having eaten the family meal, further demonstrating that he recalled the decedent's allergy. Thus, we can find no error in the trial court's determination that, under the circumstances of this case, Villegas' knowledge of the decedent's allergy could properly be imputed to defendant, despite the fact that he acquired that knowledge prior to his employment at defendant's restaurant.

¶ 75    While not discussed by the parties, we also observe that the Restatement (Third) of Agency discusses the principle that notice of a fact that an agent knows is generally imputed to the principal if knowledge of the fact is material to the agent's duties to the principal. Restatement

---

obtaining the knowledge is in a subordinate or a superior position in the corporation, that knowledge is still chargeable to the corporation if the information concerns a matter within the scope of the agent's authority.").

(Third) of Agency § 5.03 (2006). At least two justices of our supreme court have cited section 5.03 with approval as representing the rules of agency law. See *In re Dar. C.*, 2011 IL 111083, ¶ 141 (Burke, J., specially concurring, joined by Freeman, J.). The comments to section 5.03 make clear that the imputation of the agent's knowledge is appropriate "regardless of how the agent came to know the fact or to have reason to know it." Restatement (Third) of Agency § 5.03 cmt. e (2006). So long as the agent is aware of the fact at the time he takes authorized action on behalf of the principal and the fact is material to the agent's duties to the principal, "notice of the fact is imputed to the principal although the agent learned the fact prior to the agent's relationship with the principal, whether through formal education, prior work, or otherwise. Likewise, notice is imputed to the principal of material facts that an agent learns casually or through experiences in the agent's life separate from work." *Id.* This provides additional support to our determination that the trial court's imputation of Villegas' knowledge to defendant was wholly appropriate in this case.

¶ 76                                  Speculative Testimony

¶ 77        Defendant next contends that the trial court erred in permitting Villegas and Padilla to provide improper speculative testimony. The admission of evidence is within the sound discretion of the trial court, and we will not disturb such decisions on review absent a clear abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). "[A] trial court abuses its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason and disregards recognized principles of law, or if no reasonable person would take the position adopted by the trial court." *Campbell v. Autenrieb*, 2018 IL App (5th) 170148, ¶ 26.

28

¶ 78    A lay witness may express an opinion in a case so long as that opinion is based on the witness' personal observations, is one that a person is generally capable of making, and is helpful to a clear understanding of the issue at hand. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 44; *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 581 (1993). However, "[i]f the basis of the opinion includes so many varying or uncertain factors that the lay witness is required to guess or surmise in order to reach an opinion, the opinion is objectionable as speculation or conjecture." (Internal quotation marks omitted.) *Rose v. Mercedes-Benz U.S.A.*, 378 Ill. App. 3d 615, 625 (2007); *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 38.

¶ 79    In this case, defendant contends that Villegas and Padilla were permitted to engage in improper speculation when they testified that they would have placed a sign near the serving bowl had they known it was required and that, in that case, the decedent likely would not have ingested the food. As an initial matter, we agree with plaintiff that defendant has forfeited any objection to Padilla's testimony by failing to object at trial. See *Simmons v. Garces*, 198 Ill. 2d 541, 567 (2002) (where counsel failed to timely object, the objections to the admission of evidence were forfeited). We also observe that, with respect to Padilla, defense counsel engaged in the same type of allegedly objectionable questioning on redirect examination, so defendant cannot now claim prejudice from this line of questioning.

¶ 80    With respect to Villegas, defendant claims that he improperly speculated as to what he would have done had he known that food labels were required for the family meal and further speculated what the decedent would have done in response. After examining Villegas' testimony, we cannot find that the trial court's admission of such evidence was an abuse of discretion.

¶ 81        First, to the extent that defendant contends that Villegas' testimony violated the plaintiff's own motions *in limine*, we cannot find this to serve as a basis for reversal. A ruling on a motion *in limine* is an interlocutory order which remains subject to reconsideration by the trial court throughout the trial. *Reid v. Sledge*, 224 Ill. App. 3d 817, 822 (1992). Thus, even where a trial court grants a motion *in limine*, "[t]he court reserves the right to change its mind as the trial unfolds and as the context becomes clearer for the evidence in question." *County of Peoria v. Couture*, 2022 IL App (3d) 210091, ¶ 86. See *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 36 (no error in permitting witness to testify despite previous grant of motion *in limine*).

¶ 82        Additionally, it is clear that Villegas' testimony was based on his own personal knowledge and his personal experience working in a kitchen. While there were no official allergen policies in place at the time of the decedent's injury, Villegas testified that he is now a certified sanitation manager, meaning that he has greater knowledge of proper food safety practices than he did at the time at issue. Defendant is correct that a party's actions cannot be judged in hindsight but must be viewed based on the circumstances at the time. See *Williams v. Elkin*, 239 Ill. App. 3d 1094, 1098 (1992). We cannot find, however, that it was improper speculation for Villegas to use his regular kitchen practices and experiences to testify about whether he would have employed those same practices in this case had he been aware of them at the time. We also observe that the questions posed to him by plaintiff's counsel were straightforward and did not require guessing or conjecture, further lessening any potential impropriety.

¶ 83        We also reject defendant's suggestion that Villegas was asked to opine that the decedent would not have consumed the seafood if it had been labeled. Defendant identifies three pages of the trial transcript in which it contends that the objectionable questioning occurred. In each

question on those pages, however, plaintiff's counsel asked Villegas "what would *you* have done" differently (emphasis added) if he had received allergen training. Counsel never asked Villegas to opine as to what *the decedent* would have done in response, and the only testimony even arguably suggesting anything about the decedent's actions was Villegas' testimony that "it would have been way different" and "we wouldn't be here." We therefore cannot find that the trial court's admission of this testimony constituted an abuse of discretion.

¶ 84                                              FDA Food Code

¶ 85        The final alleged trial error identified by defendant concerns the trial court's admission of an "incomplete, inapplicable, and prejudicial" portion of the FDA Food Code. As noted, the testimony of defendant's food safety expert was done via evidence deposition, which occurred on June 21, 2019, in connection with the parties' first trial. As part of that deposition, plaintiff's counsel used the FDA Food Code—specifically, the portion of the model code which later served as the basis for reversal of the judgment in the first trial. The provision included as a deposition exhibit, however, did not contain the entirety of the provision but was a truncated version. When the deposition was admitted during the retrial, defense counsel did not include the exhibits to the deposition, so plaintiff's counsel sought to admit the deposition exhibit into evidence at the end of trial. Defense counsel objected, indicating that the provision was not the complete version but was truncated, so the complete version should be admitted instead.

¶ 86        Counsel and the trial court then engaged in the following discussion:

> "THE COURT: Hold on. When he gave his deposition, is the paper that you're holding in your hand the document that was marked Exhibit—what's it called?
>
> PLAINTIFF'S COUNSEL: 4.
>
> THE COURT: 4?

31

DEFENSE COUNSEL: Yeah, I presume it was, Judge. I don't recall, but I presume it was.

THE COURT: So we're not going to change the exhibits that were used at the evidence dep. Exhibit 4 was an exhibit that was used in the evidence dep. It would be attached to the transcript. I will receive it because that's what was used. I'm not—the transcript is submitted in its entirety, including the exhibits that were used."

¶ 87    Defense counsel continued to object, arguing that exhibits were not admitted into evidence during a deposition but were admitted by the trial court. Defense counsel maintained that the provision should not be admitted into evidence "because it misrepresents the statute." The trial court responded:

"Very good. So we'll attach it to the transcript, submit it to the Court, and if, in fact, this is a document that the Appellate Court already said can't be considered, I won't consider it. But if there was an exhibit to the transcript, it should be submitted. I'm not admitting it in evidence. I'm not going to admit it in evidence, but it should be submitted along with the transcript."

¶ 88    Defendant now contends that the trial court erred in admitting the deposition exhibit. The record reveals, however, that the trial court never admitted the challenged provision into evidence but included it in the record solely for the sake of having a complete record of the expert's deposition. We find no error in this action. To the extent that defendant's challenge may be interpreted as a challenge to the substantive use of the provision in the cross-examination of the expert, that argument has been forfeited on appeal, as it was not raised below. See *Simmons*, 198 Ill. 2d at 567.

¶ 89                                    *Damages*

¶ 90        Defendant next raises several issues concerning the damages award. Specifically, defendant contends that (1) the damages award was excessive and (2) the award of prejudgment interest is unconstitutional.

¶ 91                                 Excessive Award

¶ 92        Defendant first contends that the trial court's damages award was excessive. In reviewing a trial court's damages award after a bench trial, the standard of review is whether the judgment is against the manifest weight of the evidence. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. "[I]n overturning a damage award, a reviewing court must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law." *Id.* (citing *MBC, Inc. v. Space Center Minnesota, Inc.*, 177 Ill. App. 3d 226, 234 (1988)). A trial court's award of damages will not be found to be against the manifest weight of the evidence "if there is an adequate basis in the record to support the trial court's determination of damages." *Id.*

¶ 93        In this case, defendant claims that the trial court's damages award was excessive where it contained duplicative damages and failed to properly distribute damages among each of the decedent's surviving kin. Defendant's claims revolve around the award of damages under the Wrongful Death Act (740 ILCS 180/2 (West 2022)). The Wrongful Death Act provides that the amount recovered in any wrongful death action "shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person." *Id.* §2(a). The factfinder in such an action "may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and

mental suffering, and punitive damages when applicable, to the surviving spouse and next of kin of such deceased person." *Id.*

¶ 94　　In this case, the trial court found in favor of plaintiff in the amount of $8,064,380, which consisted of itemized damages for (1) lost money, benefits, goods, and services ($314,380); (2) pain and suffering ($250,000); (3) grief and sorrow ($3.2 million); and (4) loss of society, which was further itemized for plaintiff ($300,000) and each of the decedent's four children ($1 million each). Defendant first claims that the trial court erred in awarding damages separately for each of these line items.

¶ 95　　Defendant submitted a proposed verdict form to the trial court, which would have itemized damages for (1) medical expenses, (2) funeral expenses, (3) the decedent's pain and suffering, and (4) "Loss of Society." He contends that, by separating out damages for grief and sorrow from the damages for loss of society, the trial court awarded duplicative damages, resulting in a double recovery. We do not find this argument persuasive.

¶ 96　　First, to the extent that defendant suggests that the trial court was bound by his proffered verdict form since plaintiff did not provide one of her own, we observe that the instant case involves a bench trial, not a jury trial. Defendant cites no authority obligating the trial court to use a particular verdict form in such a case. The trial court indicated that it would consider defendant's proposed form in determining "whether to use them or to forego those as I write my written ruling on the case." We can find no error in the trial court's conduct in doing so.

¶ 97　　Additionally, we can find no error in the trial court's separation of grief and sorrow from loss of society. Defendant cites no authority suggesting that it is improper to award damages

for both, either separately or together.[5] Indeed, as he observes, the pattern jury instructions list the two separately. See Illinois Pattern Jury Instructions, Civil, No. 31.04 (approved June 18, 2021).

¶ 98    Defendant's argument conflates "pecuniary injury" under the Wrongful Death Act with "loss of society." This, however, does not represent an accurate interpretation of the law. "Pecuniary injury" under the statute is a broad term which encompasses a number of aspects. See *id.* (including "the loss of money, benefits, good, services" as examples of pecuniary losses); see also *Passafiume v. Jurak*, 2024 IL 129761, ¶ 47 (noting that "pecuniary injuries" are broadly interpreted and include damages for the loss of material services). Our courts have found that "pecuniary injuries" under the Wrongful Death Act include the loss of society. See, *e.g.*, *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 34.

¶ 99    Loss of society includes the recognition of such concepts as counsel, comfort, and " 'love, companionship, and affection.' " *Id.* ¶ 35 (quoting *Turner v. Williams*, 326 Ill. App. 3d 541, 548 (2001)). Historically, however, loss of society did not include grief and sorrow and, consequently, such damages were not recoverable in a wrongful death action. *Id.*; *Turner*, 326 Ill. App. 3d at 548. See *Elliott v. Willis*, 92 Ill. 2d 530, 539 (1982) (distinguishing between loss of society and bereavement in permitting the former and not the latter as damages in a wrongful death action).

---

[5] Defendant cites one case, *Holaves v. Cardiovascular Institute at OSF, LLC*, 2018 IL App (2d) 170573-U, in support of his argument. That case, however, is an unpublished order filed prior to January 1, 2021, so may not be cited in this court, even as persuasive authority. See Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025). In any event, even if it was properly before us, that case provides no support for defendant's position that grief and sorrow and loss of society are duplicative.

¶ 100    In 2007, however, the legislature amended the Wrongful Death Act to expressly include "damages for grief, sorrow, and mental suffering" as "pecuniary injuries" which were covered by the statute. Compare 740 ILCS 180/2(a) (West 2006) with 740 ILCS 180/2(a) (West 2008). Thus, under the law in effect at the time of the decedent's trial, grief and sorrow were permissible components of the damages award. As the law is clear that "loss of society" and "grief and sorrow" are distinct components of compensable pecuniary injury under the Wrongful Death Act, we cannot find that the trial court's separation of these components in determining the damages award in the instant case constituted an abuse of discretion.

¶ 101    We are similarly unpersuaded by defendant's contention that the trial court improperly apportioned the loss of society damages among plaintiff and the children. The Wrongful Death Act provides that the damages in a wrongful death action:

> "shall be distributed by the court in which the cause is heard *** to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person." 740 ILCS 180/2(b) (West 2022).

The statute further instructs that "[t]he trial judge shall conduct a hearing to determine the degree of dependency of each beneficiary upon the decedent. The trial judge shall calculate the amount of damages to be awarded each beneficiary, taking into account any reduction arising from either the decedent's or the beneficiary's contributory fault." *Id.* § 2(i).

¶ 102    In this case, the trial court included an apportionment of loss of society damages in its damages award and determined that each of the children suffered the same amount of damages. Defendant contends that this violated the statute, as the trial court did not hold a separate

36

dependency hearing. We observe, however, that the trial court's order did not calculate the amount of damages to be awarded to each beneficiary. Instead, the trial court found that the amount of damages each child *incurred for loss of society* was $1 million. This is a slightly different calculation. The total judgment award consisted of more than simply loss of society damages, including damages for (1) lost money, benefits, goods and services; (2) pain and suffering; (3) grief and sorrow; and (4) costs and prejudgment interest. The dependency hearing and subsequent apportionment concerns the total judgment award, not simply the subset concerning loss of society damages. See *McHale*, 2015 IL App (1st) 132625, ¶ 108 n.9 (improper verdict form submitted to the jury included separate lines for apportionment of all aspects of wrongful death damages to each beneficiary). As such, we cannot find that the trial court erred in determining the extent of each child's loss of society damages in calculating the total damages award.

¶ 103                                    Prejudgment Interest

¶ 104        Defendant also challenges the trial court's award of prejudgment interest, contending that the prejudgment interest statute is unconstitutional. We, however, agree with plaintiff that defendant has forfeited this argument on appeal. Defendant's argument in its opening brief is one paragraph long, cites a single case, and indicates that "[a]dditional bases for the unconstitutionality of the award are identified in Defendant's Response to Plaintiff's Motion for Prejudgment Interest and incorporated herein." After plaintiff raised the issue of forfeiture in her response brief, defendant's reply brief simply indicated that the case it relied on was properly cited and that "constitutionality of the prejudgment interest statute has not been decided by the Illinois Supreme Court and Defendant is within its right to preserve their right to raise it."

¶ 105    "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented." (Internal quotation marks omitted.) *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52. As such, issues must be fully briefed and argued to be considered. *Id.* Defendant's "arguments" in this case do not engage with any of the numerous cases concerning the constitutionality of the prejudgment interest statute. We further agree with plaintiff that the single case defendant does cite—*Cotton v. Coccaro*, 2023 IL App (1st) 220788—is cited in an arguably misleading way, as defendant cites only to a portion of the defendant's argument in that case and does not even include the fact that *Cotton* ultimately found the statute constitutional. Defendant's "incorporat[ion]" of its arguments below does not remedy the deficiencies in its argument on appeal. Other courts have found challenges to the prejudgment interest statute forfeited when the arguments on the issue were similarly underdeveloped. See *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 119; *Ramirez v. Carobene*, 2025 IL App (1st) 240203, ¶ 47. Consequently, we find defendant's argument to be forfeited and have no need to consider it further.

¶ 106                              *Contributory Negligence*

¶ 107    The final issue raised by defendant on appeal concerns the apportionment of fault. The trial court found that 40% of the decedent's injury could be attributed to the decedent's own conduct, while the remaining 60% of the injury was attributable to defendant's negligence. On appeal, defendant contends that the trial court's failure to find defendant more than 50% at fault was against the manifest weight of the evidence.

¶ 108    A person is contributorily negligent "when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances, and such action is a proximate cause of his or her injury." *Cooke v. Maxum Sports Bar & Grill,*

38

*Ltd.*, 2018 IL App (2d) 170249, ¶ 93 (citing *Logan v. U.S. Bank*, 2016 IL App (1st) 152549, ¶ 20). A trial court's finding of contributory negligence will not be disturbed unless it is against the manifest weight of the evidence. *Id.*

¶ 109        In this case, the trial court found the decedent to be contributorily negligent, as it found that a reasonable person with an allergy to seafood would have investigated whether a meal contained seafood prior to ingesting it. While it determined that the decedent's fault was slightly mitigated by the fact that his prior exposure to seafood had led to "relatively benign" reactions, it nevertheless found that the decedent bore at least some responsibility for his own death.

¶ 110        Defendant does not challenge the trial court's findings as to the decedent's negligence but contends that the proportion of fault attributed to the decedent should have been greater, as the evidence established that his proportion of fault was greater than defendant's. Defendant's arguments are primarily based on challenging the strength of the evidence of its own negligence, namely, by claiming that the trial court's findings were based on "inapplicable standards and inadmissible evidence." We note that the trial court is "in a superior position to observe the witnesses' testimony, to judge their credibility, and to determine the weight their testimony and other evidence should receive." *Cooke*, 2018 IL App (2d) 170249, ¶ 93. Thus, to the extent that defendant asks us to reweigh the evidence, we decline to do so.

¶ 111        We further observe that, with respect to defendant's challenges to the trial court's reliance on the Villegas' testimony, we have rejected his arguments earlier in this decision, in affirming the admission of his testimony and in affirming the trial court's imputation of his knowledge to defendant. See *supra* ¶¶ 71-83.

¶ 112     The remainder of defendant's arguments concern the trial court's reliance on Parsons, plaintiff's food expert. Defendant claims that Parsons relied on inapplicable standards, making reliance on his testimony unreasonable. As an initial matter, we note that defendant never challenged Parsons' qualifications as a food safety expert, and there is no dispute that Parsons was permitted to testify as an expert on the issue of food safety. Defendant is, however, correct that an expert's opinion is only as valid as the basis underlying that opinion. See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 163; *Petraski v. Thedos*, 382 Ill. App. 3d 22, 28 (2008).

¶ 113     In this case, Parsons testified extensively about the bases for his opinions, including both general industry standards and, more specifically, the FDA Food Code and ServSafe, a food safety training program which was in effect at the time of the decedent's injury. While defendant disagrees with Parsons' interpretation of the cited provisions, naturally suggesting that his own expert's testimony should be afforded more weight, we find that Parsons' opinions were adequately supported and that the trial court was therefore permitted to give those opinions the weight it determined they should be afforded.

¶ 114     Defendant is correct that the trial court made a reference to Parsons testifying that defendant "violated [the] Chicago Board of Health Rules and Regulations Pertaining to Bulk Foods" which appears to be technically inaccurate. While the regulations were part of the evidence in this case, as the trial court took judicial notice of them, Parsons did not specifically cite to them but cited more generally to the applicable law and industry standards. We cannot find, however, that the trial court's single-paragraph reference to the regulations in the "Summary of Evidence" section of its 15-page opinion serves to lessen the trial court's overall analysis and findings concerning the level of defendant's culpability. Accordingly, we cannot

find that it was against the manifest weight of the evidence for the trial court to determine that defendant's level of fault was greater than the decedent's.

¶ 115                                                  CONCLUSION

¶ 116          The trial court's judgment is affirmed in its entirety. First, the Workers' Compensation Act did not bar plaintiff from filing a civil action. Second, the trial court's rulings concerning the admission of evidence and other trial matters were proper. Third, the damages award was not excessive. Finally, the trial court's finding that the decedent was 40% at fault for his injury was not against the manifest weight of the evidence.

¶ 117          Affirmed.

*Rivas v. Benny's Prime Chophouse, LLC*, 2025 IL App (1st) 242044

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 24-L-0587; the Hon. Thomas M. Cushing, Judge, presiding. |
| **Attorneys for Appellant:** | Steven C. Wolf, Lee A. Laudicina, and Siri E. Arends Graham, of Best, Vanderlaan & Harrington, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Elizabeth A. Kaveny, of Kaveny + Kroll, LLC, of Chicago, and Colleen L. Murphy and Richard J. Grossman, of Steinberg, Burtker & Grossman, of Chicago, for appellee. |