**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250564-U

Order filed March 20, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| AMEENA ALI, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-25-0564 |
| v. | ) | Circuit No. 22-DC-873 |
| | ) | |
| MIR MAMOON ALI, | ) | |
| | ) | Honorable |
| Respondent-Appellant. | ) | Robert E. Douglas, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Brennan concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: The circuit court properly allocated parenting time and decision-making authority concerning the parties' minor children.

¶ 2      On October 6, 2025, the circuit court of Du Page County entered a judgment of dissolution of marriage between petitioner, Ameena Ali, and respondent, Mir Mamoon Ali. On that same date, the court also entered a separate order that allocated parenting time and decision-making authority

with respect to the parties' minor children. Mir now appeals from the court's allocation order. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. General Background

¶ 5        The parties were married on October 15, 2014, and have four children: N.A., born in 2015; A.A., born in 2016; Y.A., born in 2018; and M.Y.A., born in 2020. On September 27, 2022, Ameena filed a petition for dissolution of marriage. The court subsequently appointed Heena Jeelani as guardian *ad litem* and, in April 2023, entered an order that allocated Mir approximately 60% of parenting time and Ameena approximately 40% of parenting time.

¶ 6        On March 27, 2024, Ameena filed an emergency motion to restrict Mir's parenting time and for temporary sole decision-making authority. In her motion, Ameena asserted that Mir had "engaged in a course of conduct intended to separate the children from Ameena as much as possible, clearly showing that he [was] incapable of coparenting with Ameena or fostering a good and healthy relationship between her and the children." Ameena further asserted that Mir had accused her and her boyfriend, Danny Serrato, of abusing and neglecting the children, and that Mir's conduct had "intensified and escalated to the point where the children [were] exhibiting behavior akin to alienation."

¶ 7        On March 29, 2024, the court entered an order in which it found that Mir "[had been] coach[ing] the children in this matter" and then granted the emergency motion and ordered Mir's parenting time to be supervised and Ameena to have sole decision-making authority for the children. The court also appointed Dr. Mark Drummond as an independent evaluator pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS

2

5/604.10(b) (West 2024)). The court ordered Drummond to interview the parties and then provide recommendations to the court regarding permanent parenting time and decision-making authority.

¶ 8                    B. Bench Trial and Interim Events

¶ 9        On December 16, 2024, bench trial commenced on Ameena's petition for dissolution of marriage. Throughout the trial, the court heard testimony from Jeelani, Drummond, the parties, and counselors and visitation supervisors in the matter.

¶ 10                        1. *Witness Testimony*

¶ 11                        i. *Jeelani's Testimony*

¶ 12        Jeelani testified that, during her investigation as guardian *ad litem*, she reviewed documents that included Drummond's report, the supervised parenting time reports, text messages, e-mails, the court file, and pleadings. She also spoke with witnesses who included members of both parties' families, the children, the children's therapist, Mir's therapist, and Drummond.

¶ 13        Jeelani explained that, during her time as guardian *ad litem*, each party had alleged that the other had been abusing the children. In fall 2023, Mir alleged that one of the children had suggested that Ameena had put baby powder in her nose. After Jeelani learned of Mir's allegation, she spoke with the parties and met with the children. None of the children mentioned the alleged incident and Mir later clarified to Jeelani, immediately before a court hearing, that "it may have been a misunderstanding, and that [Ameena] may have gotten baby powder on her nose while changing the youngest one's diaper."

¶ 14        In either fall 2023 or January 2024, Mir further alleged that the children were being hit and locked in their rooms. Thereafter, Jeelani examined every door in Ameena's house and found that none of them had locks. Jeelani also spoke with the children at each party's house. N.A. initially stated that Ameena had locked her in her brothers' room after she had questioned Ameena's

3

request that she clean her brothers' room. N.A. later recounted the same facts, except that she instead stated that Ameena had locked her in her own room. Y.A. told Jeelani that he did not want to speak with her unless N.A. was present, that he "just want[ed] to say everything that [N.A. said]," and that he "hate[d]" Ameena. Jeelani noticed that two of the children would bite their nails and another would get a migraine whenever they spoke with her.

¶ 15        Jeelani also testified that, during one of her visits with the children, A.A. appeared to have "a list of things she was supposed to tell [Jeelani]," and while speaking with Jeelani, forgot one of the "things" that she was supposed to say. Jeelani asked A.A. who had told her what to say and A.A. responded that Mir had spoken with the children and that N.A. had told her what to say after Mir had first spoken with N.A. A.A. also stated that she would receive a puppy if she told Jeelani the "things" that she was supposed to say. Later, N.A. also stated that she would receive a kitten if she told Jeelani similar "things." After Jeelani met with the children, Ameena sent her a text message to inform her that Y.A. had stated that Mir would take away his gaming system if he did not say "those things" to Jeelani.

¶ 16        Regarding additional observations that she had made of the children, Jeelani testified that she had once seen N.A. attempt to high-five Serrato but then "quickly back[***] off" after Y.A. put his hands on his hips and growled at N.A. as if asking her, "[W]hat do you think you're doing?" Jeelani also testified that the children seemed to use language that was not typical for their age and that seemed scripted at times. Jeelani stated that, for example, during one of her visits with the children, N.A. had insisted that she, Jeelani, and A.A. go on a walk, despite it being "quite chilly" outside. Jeelani further stated that, on their walk, N.A. had told her "out of the blue" that she "[couldn't] wait to go either live or stay with [Mir]." Jeelani also stated that A.A. had become uncomfortable after N.A.'s statement, that she had then told the children that they did not need to

4

discuss the topic, and that A.A. had thereafter relaxed and N.A. had immediately expressed that she wanted to end the walk.

¶ 17    Jeelani testified that Mir had also alleged that the children had mentioned that Serrato had hit one of them with a belt. The next day, Jeelani met with the children during Mir's supervised parenting time. Before Jeelani talked with the children, Mir insisted that she speak with N.A. about "Mathilda's mother" and Serrato. When Jeelani later spoke with N.A. outside of Mir's presence, N.A. never mentioned Mathilda's mother or anything about Serrato hitting one of the children with a belt, but N.A. did ask to have a sleepover with Mir. Jeelani and the children subsequently returned to Mir's house because Ameena had arrived to pick up the children. Once they returned to the house, Mir asked Jeelani whether the children had mentioned Mathilda's mother or that Serrato had hit one of the children with a belt, and after Jeelani stated that they had not, Mir insisted that Jeelani talk with N.A. again. Jeelani initially declined to talk again with N.A. However, after she noticed later that N.A. and A.A. did not want to leave Mir's house, Jeelani spoke with N.A., who stated, while biting her nails, "I just want to stay. Why can't we stay, why can't we stay?"

¶ 18    While investigating Mir's allegation concerning Serrato, Jeelani also spoke with Rodney Kern, an individual who supervised Mir's parenting time with the children. Jeelani stated the following regarding her discussion with Kern:

> "So what [Kern] did mention was that [Mir] and [N.A.] have this little, if you want to call it a schtick or whatever you want to call it, when she's about to say something, she'll look at [Mir], make eye contact with [Mir], and then look over at the supervisor to make sure that the supervisor is there, and the supervisor is listening. And then she'll usually say something, and then [Mir] will go up and say, what, this—I'm just imitating what Rodney

imitated. He said what. He did what. Why didn't you tell me. And when that happens, there is no further conversation beyond that."

¶ 19    Later, Jeelani spoke with the children again at Ameena's house. There, A.A. told Jeelani that she liked when the supervisors were present because Mir was "nicer" when they were there and "mean" when they were not there. A.A. explained that, when the supervisors were absent, Mir would whisper to the children what to say and would later "get[***] angry" when the children did not say what he told them to. A.A. further explained that Mir had told the children to say that Serrato had hit the boys with a belt, which was untrue. Separately, N.A. stated that she "sometimes told [Jeelani] stuff so she [could] stay with [Mir]."

¶ 20    During her investigation, Jeelani also spoke with Laura Discipio, Mir's therapist. Discipio told Jeelani that, once, Mir had asked her whether she was a mandated reporter and whether she could report what the children had told him to the Department of Children and Family Services (DCFS). Discipio also told Jeelani that she had informed Mir that she could not report such things unless she or another therapist heard them from the children themselves and that Mir should file a DCFS report if the children were telling him things. Additionally, Discipio told Jeelani that, during a conversation that she had had with A.A. while Mir was present, Discipio asked A.A. "innocuous questions" and A.A. would hesitate and look at Mir before answering each question.

¶ 21    Jeelani was aware that, on August 1, 2024, a DCFS investigation had begun regarding allegations that Ameena and Serrato had abused the children. One of the more specific allegations that the investigation involved was that Ameena and Serrato had locked the children in their rooms. The DCFS case worker who oversaw the investigation informed Jeelani that she had received the complaint in the matter, that she had spoken with Ameena and the children, and that Ameena had informed her of the party's ongoing dissolution proceeding and advised her to talk to Jeelani to

6

learn more information. The case worker also asked Jeelani a series of questions, including what Jeelani's level of involvement was with the family, whether Jeelani had visited with the children, and whether the children favored one of the parties. Jeelani answered each of the case worker's questions and the investigation was later determined to be unfounded.

¶ 22      On cross-examination, Jeelani acknowledged that Mir had represented that his allegations against Ameena and Serrato were based on facts that the children had conveyed to him. Following her testimony, Jeelani asked the court whether she was discharged. The court informed Jeelani that she was not discharged and that it would not enter a discharge order until the "end of the case," to allow for her to later provide rebuttal testimony, if needed.

¶ 23      *ii. Drummond's Testimony*

¶ 24      Drummond testified that, while conducting his section 604.10(b) evaluation, he met with both parties and the children, administered psychological testing, reviewed collateral information, and spoke with collateral contacts, including Jeelani. Following his investigation, Drummond prepared a report in which he recommended, in sum, that the children "have primary residential custody with [Ameena], with generous and extended weekend time with [Mir] during the school year, and then a 50/50 parenting time throughout the summer." A copy of the report was admitted into evidence.

¶ 25      On cross-examination, Drummond testified that, at the time of his report, he had not spoken with the counselors involved in the matter. He further testified that, during his conversation with Jeelani, Jeelani had suggested that he "consider making the overnight that [he had] suggested, contingent on [Mir] attending therapy." Drummond explained that he had independently believed that Mir needed counseling, found Jeelani's suggestion to be reasonable, and so incorporated the suggestion into his report. Drummond stated that Jeelani had also told him that Mir's family had

7

"strongly expressed to her *** that [Mir] not get primary custody." Drummond explained that he never contacted Mir's family to confirm their position because Jeelani had informed him of their position "right before" his report was due.

¶ 26    Drummond also testified that, during his conversation with the children, N.A. and A.A. had told him that they preferred to spend the majority of their time with Mir. Drummond explained that, after having worked as an independent evaluator for 30 years, he had become "pretty good" at discerning whether children had been coached, but that he did not believe that the children had been coached to tell him what they had.

¶ 27    Additionally, Drummond stated that his recommendation in the matter would change if he were to learn that the children were continuing to be subject to corporal punishment, that either party was denying the children their medical needs, or that either party was withholding the other's parenting time. Drummond explained that, if he were to learn that one of the parties was denying the children their medical needs, then he would suggest that the party not be allowed primary parenting time or medical decision-making authority.

¶ 28    On re-direct examination, Drummund testified that he had expressed in his report that he was concerned by the fact that the children often villainized Ameena and glorified Mir. Drummond explained that this behavior was typically associated with alienation and that he had recommended that the children spend more time with Ameena partly because he believed that the additional time would stop the children's behavior.

¶ 29                        iii. *Kern's Testimony*

¶ 30    Kern testified that he had been a visitation supervisor for two-and-a-half years, during which time he had supervised approximately 25 visits with the children. During his time as a supervisor, Kern had never heard anything that would have suggested that Mir was influencing the

8

children's statements during the supervised visits. Kern had told Jeelani that the children had mentioned that they had been hit with a belt, and that he believed that the children's statements were credible. As of the time of trial, the children continued to state that, at Ameena's house, they were being subject to corporal punishment.

¶ 31                         iv. *Douglas Giertz's Testimony*

¶ 32        Douglas Giertz testified that he had been a visitation supervisor for approximately two years and had supervised approximately 20 of the children's visits with Mir. Giertz never witnessed Mir coaching the children as to what to say and never felt as though the children's statements in his presence had been orchestrated.

¶ 33                         v. *Gia Peckhart's Testimony*

¶ 34        Gia Peckhart testified that she had provided counseling services for the children. During the children's counseling sessions, they informed Peckhart that Ameena would hit or spank them as a punishment. Ameena later admitted to Peckhart that she used corporal punishment and Peckhart advised her on alternative methods of addressing the children's behavior. Separately, Jeelani provided Peckhart with information regarding "a belt situation" that involved the children and Serrato. During a subsequent counseling session, the children confirmed "something about a belt" but had inconsistent stories from one another. Peckhart also discussed the situation with Ameena, who then explained that Serrato had not hit the children with a belt, but, rather, had taken out a belt and snapped it. Ultimately, Peckhart did not believe that the children were being abused during Ameena's parenting time.

¶ 35        Additionally, Peckhart testified that Jeelani had also informed her that she believed that Mir had been coaching the children. Peckhart independently believed that there were words and phrases that the children had used that were inappropriate for their ages and sounded like they had

9

come from an adult. Although Peckhart had expressed to Jeelani that she could understand Jeelani's concern that Mir had been coaching the children, Peckhart never told Jeelani that she also believed that Mir had been coaching the children.

¶ 36                                    vi. *Discipio's Testimony*

¶ 37          Discipio testified that Jeelani had informed her that she was concerned that Mir had been coaching the children. Discipio later met with the children while Mir was present. During the meeting, Discipio "did small talk" with the children and noticed that A.A. did not respond to any of her questions and looked at Mir as if expecting an answer from him. Discipio later advised Mir that A.A.'s behavior suggested that she was seeking his approval and "to be careful of that." Mir explained that Discipio's questions had likely made A.A. feel uncomfortable and anxious, partly because A.A. did not know Discipio. Other than A.A.'s behavior in response to her questions, Discipio did not notice anything about the children's behavior that caused her to feel concerned. She also did not think that there were "coaching issues," as of the time of trial.

¶ 38          Discipio further testified that she and Peckhart believed that Jeelani had been inaccurately conveying their opinions to the court. Discipio explained that, "many a times when [she] would try to tell [Jeelani] something, [she] would get pushback from her: You don't know him, you don't know him."

¶ 39                                    vii. *Mir's Testimony*

¶ 40          Mir testified that he had never attempted to coach the children or to tell them what to say. He also testified that he had never attached a listening device to the children.

¶ 41                                    2. *Interim Events*

¶ 42          On December 19, 2024, following the close of witness testimony that day, the court entered an order that continued the trial until April 2025, discharged Jeelani, and granted Jeelani leave to

file her final fee petition. The court also "temporarily modified" its March 29, 2024, order by removing the earlier requirement that Mir's parenting time be supervised. In April 2025, prior to the trial resuming, the parties began to engage in settlement negotiations.

¶ 43 On April 14, 2025, Ameena filed a motion to reopen proofs, to continue trial, and for other temporary relief (motion to reopen proofs). In the motion, Ameena alleged that, around March 28, 2025, N.A. had injured her finger after she had fallen while roller skating at Mir's residence, and that, on April 3, 2025, the children's medical group had notified her that the children were being treated at an emergency care center. Ameena further alleged that Mir had subsequently informed her that he had taken the children to the emergency care center partly because N.A. had been experiencing pain in her elbow. Additionally, Ameena alleged that, on April 8, 2025, she had reviewed N.A.'s medical records and learned that N.A. had told the emergency care physicians that Ameena had caused her elbow injury by twisting her arm, which the physicians had then reported to DCFS, prompting an investigation. Ameena asserted that Mir was likely involved in making the allegations to DCFS and requested that the court reopen proofs and continue the trial because evidence of Mir's involvement in the pending DCFS investigation was relevant to the assessment of Mir's credibility and could impact the court's final judgment.

¶ 44 On April 15, 2025, the court granted Ameena's motion to reopen proofs and scheduled the trial to resume on September 3, 2025. On August 14, 2025, Mir filed a motion to recall Jeelani, examine DCFS investigators, and either examine or disqualify Ameena's counsel (motion to conduct additional witness examination). In his motion, Mir alleged that, prior to trial, Jeelani had stated to the court that the counselors and a visitation supervisor in the matter were all concerned that Mir was coaching the children, which "had resulted in the court keeping supervised visitation in place." Mir further alleged that, later, Jeelani's statement had been "directly refuted" by multiple

11

witnesses who had testified at trial that "there was no evidence of coaching provided to the [c]ourt." Mir also alleged that DCFS reports showed that Jeelani had informed a DCFS investigator that she had testified that Mir was coaching the children and that the court had found the same and limited his parenting time. Additionally, Mir alleged that Ameena's counsel, Elizabeth Koziol, had admitted that she had communicated with DCFS while the investigation was pending, but that none of the DCFS reports noted that Koziol had done so. Mir argued that it was necessary for Jeelani to be recalled and for Koziol and the DCFS investigators to testify because their testimony would enable him to show "the use of a prior [c]ourt [o]rder (that has since been disregarded by the [c]ourt) to manipulate DCFS investigations," "to provide the [c]ourt with evidence of a planned conspiracy to commit fraud upon DCFS and the [c]ourt," and "to show that the 'coaching' narrative is false."

¶ 45   Two days after Mir filed his motion to conduct additional witness examination, his counsel filed a motion to withdraw. The court later granted the motion and, thereafter, Mir represented himself *pro se*.

¶ 46   On September 3, 2025, prior to the trial resuming, the court conducted a hearing on Mir's motion to conduct additional witness testimony. During the hearing, the court articulated the following:

> "I have read the DCFS reports. DCFS indicates—in many of them they are the same narrative in many spots, that DCFS contacted [Jeelani]. Not the other way around. And that [Jeelani] reported that the [c]ourt had found that [Mir] had engaged in coaching. Those were the findings of the [c]ourt, which had never been overturned in a motion to reconsider or in any other way.

12

Further, the—Ms. Koziol—and although the wording is strange in the DCFS report that [Mir] had been caught coaching, it goes to the fact that the [c]ourt found that [Mir] was coaching the children, which was correct. That is the only statement which—is attributed to Ms. Koziol in all of the DCFS reports that the [c]ourt just reviewed.

The [c]ourt finds that the motion to [conduct additional witness examination] is without merit, misstates facts in evidence, and so that motion is denied."

¶ 47                                  3. *Continuation of Witness Testimony*

¶ 48        Immediately after the court denied Mir's motion to conduct additional witness examination, the trial resumed. Ameena testified that she had used corporal punishment on the children until she had later spoken with Peckhart, who had advised her to use other forms of punishment. After she spoke with Peckhart, Ameena stopped using corporal punishment on the children and began to discipline them by placing them in timeout and taking their belongings. Ameena also testified that she had never abused the children during her marriage to Mir, and that, although Serrato had raised his voice at the children and tried to scare them into behaving, she had never witnessed him hit or otherwise physically harm the children.

¶ 49                               C. *Judgment and Notice of Appeal*

¶ 50        On October 6, 2025, the court entered a judgment order that allocated the parties' decision-making authority and parenting time. In the order, the court noted that, in his custody evaluation report, Drummond had recommended: (1) that, during the school year, Ameena have primary parenting time and Mir have parenting time every other weekend with an extra weekday predicated upon him attending counseling, (2) that, during the summer, the parties equally share parenting time, (3) that the parties alternate spring and winter breaks, (4) that the parties "be entitled to three non-consecutive weeks of parenting time during the summer *** and equally share the school

13

winter and spring breaks," and (5) that the parties "be entitled to a specifically scheduled period of time to call the children on their non-custodial days." Additionally, the court noted that Drummond had also recommended that Ameena be responsible for all routine medical care for the children and that both parties have the authority to obtain non-routine medical care for the children. The court stated that it had found Drummond's testimony to be "highly credible" and that it had given "great deference" to his recommendations.

¶ 51        In its judgment order, the court also explained that it had considered the best interest factors set forth under sections 602.5 and 602.7 of the Act. The court found that the factor pertaining to the wishes of the children weighed in favor of Mir, but that, nevertheless, it had "not considered" the factor because, although the children had stated that they preferred to live with Mir, their credibility was undermined by the court's finding that Mir had coached the children and that the children had "made multiple abuse allegations against Ameena and [Serrato]" that were deemed incredible and culminated in four unfounded DCFS investigations. The court further found that the factors relating to the parties' ability to jointly make decisions, the level of conflict, the level of participation in previous decision making, the distance between residences, the cost and difficulty of transporting the children, the schedules of the parties and children, the ability of the parties to cooperate, and the willingness and ability of each party to cooperate with the other and prioritize the needs of the children each either weighed in favor of Ameena or was neutral. The court also found that various other best interest factors were neutral.

¶ 52        Based on its findings, the court awarded the parties joint decision-making authority for all major decisions related to the children. The court further awarded Mir parenting time every other weekend during the school year, as well as an extra weekday that would be contingent upon him attending counseling, and awarded Ameena all other parenting time not allotted to Mir.

14

Additionally, the court awarded the parties equal parenting time during the summer and on holidays.

¶ 53　　　On October 24, 2025, Mir filed his notice of appeal.

¶ 54　　　　　　　　　　　　II. ANALYSIS

¶ 55　　　First, Mir argues that the circuit court erred by denying his motion to conduct additional witness examination. Mir asserts that the DCFS records pertaining to the investigation into N.A.'s elbow injury "became known to [him] only after the trial had started" and showed that Jeelani had been involved in the investigation and told DCFS that "Mir had a history of coaching the children," even after the court had discharged Jeelani as the guardian *ad litem* and her "coaching narrative" had been "debunked" at trial. Additionally, Mir asserts that the DCFS records further showed that there was "obvious" communication between Koziol and DCFS. Mir argues that the court should have allowed him to examine Koziol and DCFS investigators, and to further examine Jeelani, because their testimony would have shown "how a narrative repudiated at trial continued to influence child-protection investigations, and, more importantly, how, who, or why was DCFS informed to contact [Jeelani]." Mir further argues that, by denying his motion to conduct additional witness examination, the court deprived him of a meaningful opportunity to elicit evidence related to the children's safety and credibility, which were issues that were central to the court's judgment.

¶ 56　　　A circuit court's evidentiary rulings are within its sound discretion, and a reviewing court will not reverse such rulings unless they are an abuse of discretion. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23. " 'A trial court abuses its discretion when it acts arbitrarily, without conscientious judgment, or, in view of all the circumstances, exceeds the bounds of reason and ignores recognized principles of law, resulting in substantial justice.' " *In re Marriage of Daebel*, 404 Ill. App. 3d 473, 486 (2010).

15

¶ 57    In denying Mir's motion to conduct additional witness examination in this case, the court noted that the available DCFS records showed that Jeelani had merely stated to DCFS that "the court had found that Mir had engaged in coaching." The court further noted that Koziol's statement to DCFS that Mir had been "caught coaching" also referenced the fact that the court had earlier found that Mir had been coaching the children. Regardless of whether, as Mir points out, witnesses at trial had testified that they did not independently believe that he had been coaching the children, the record reflects that, prior to trial, the court had indeed found that he had been coaching the children. The record further reflects that, as of the time of Mir's motion to conduct additional witness examination, the court had never vacated this earlier finding or entered one to the contrary, which supports the court's view that the statements that Jeelani and Koziol had made to DCFS were correct.

¶ 58    Moreover, although Mir was precluded from examining Jeelani, Koziol, and DCFS investigators regarding the DCFS records at issue, Mir was allowed to examine Jeelani regarding her assertion that he had been coaching the children and he did so extensively. As he himself also points out, he was also able to elicit testimony from other witnesses on the issues of whether he had been coaching the children and Jeelani's credibility. Accordingly, it was not an abuse of discretion for the court to deny Mir's requests to examine Koziol and DCFS investigators and to further examine Jeelani.

¶ 59    Nor did the court err by denying Mir's request to disqualify Koziol as a material witness. "The determination of whether counsel should be disqualified is directed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). In conducting our review, we are mindful that "[a]ttorney disqualification is generally considered a drastic measure, because it bars a party from retaining

16

the counsel of its choice and thus destroys the attorney-client relationship." *Pederson v. Houpt, P.C. v. Summit Real Estate Group, LLC*, 376 Ill. App. 3d 681, 685 (2007). Consequently, a court will disqualify an attorney only when the Illinois Rules of Professional Conduct preclude the attorney from continuing representation. *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 22. Rule 3.7(a) of the Illinois Rules of Professional Conduct prohibits an attorney from acting as an advocate and a fact witness in the same case, subject to certain exceptions. Ill. R. Prof. Conduct, R. 3.7(a) (eff. Jan. 1, 2010).

¶ 60      As we have already found, the court properly denied Mir's request to examine Koziol. Because the court properly denied this request, there was nothing that reasonably indicated that Koziol might be called as a testifying witness. Therefore, the court did not abuse its discretion by refusing to disqualify Koziol.

¶ 61      Second, Mir argues that the court erred by finding in its judgment that he had been coaching the children and that, therefore, the children's statements that they preferred to live with him were incredible. Mir again asserts that, during the trial, "witness after witness discredited and refuted [Jeelani] and the coaching narrative where they testified that there was no evidence of coaching, in fact the opposite." Mir also again points out that, following the first part of the trial, the court removed the earlier requirement that his parenting time be supervised, which, Mir asserts, "reflect[ed] that the premise for supervision had collapsed." Mir argues that, in continuing to find in the judgment that he had been coaching the children, the court failed to consider the available testimony to the contrary and failed to explain why it rejected such testimony. Mir further argues that, thus, this court should overturn the circuit court's finding in the judgment that he had been coaching the children.

17

¶ 62    Following a bench trial, we defer to the circuit court's factual findings unless they are against the manifest weight of the evidence. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Rivas v. Benny's Prime Chophouse, LLC*, 2025 IL App (1st) 242044, ¶ 48.

¶ 63    Here, Mir is correct that, at trial, multiple witnesses testified that they had never observed anything that led them to believe that Mir had been coaching the children. More specifically, Kern testified that, while supervising Mir's parenting time, he had never heard anything that would have suggested that Mir was influencing the children's statements. Giertz similarly testified that, while supervising Mir's parenting time, he had never witnessed Mir coaching the children as to what to say and had never felt as though the children's statements in his presence had been orchestrated. Additionally, Drummond and Discipio each testified that they did not believe that Mir had coached the children, and Peckhart testified that she had never reported to Jeelani that she believed that Mir had coached the children. Furthermore, Mir himself testified that he had never coached the children.

¶ 64    However, in contrast to the aforementioned witness testimony, Jeelani testified regarding specific instances in which she felt that she the children's statements to her had been coached. Jeelani testified, for example, that, some of the language that the children had used when speaking with her seemed scripted and inappropriate for their age, and that, during one of her visits with the children, A.A. had appeared to have "a list of things she was supposed to tell [Jeelani]" and, while starting to tell Jeelani some "things," forgot one of the "things" that she was supposed to say. Jeelani also testified that, during a separate occasion, N.A. had insisted that she, Jeelani, and A.A. go on a walk despite the "quite chilly" weather outside and that, during their walk, N.A. had told

18

her "out of the blue" that "[couldn't] wait to go either live or stay with [Mir]" and immediately wanted to end the walk after Jeelani had stated that they did not need to discuss the topic. Additionally, Jeelani testified that, once after she had spoken with the children, Mir had asked whether the children had discussed certain topics with her and, after Jeelani had indicated that they had not, Mir insisted that Jeelani speak with N.A. once more. Jeelani explained that she then spoke with N.A. before the children left Mir's house to go with Ameena, and that, during their conversation, N.A. had stated to Jeelani, "I just want to stay. Why can't we stay, why can't we stay?"

¶ 65        Additionally, Jeelani testified that, numerous times, the children themselves had informed her that Mir told them what to say or had otherwise influenced their statements to Jeelani and the supervisors and counselors in the matter. Specifically, Jeelani testified that, once, she had directly asked A.A. who told her what to say and that, in answer to her question, A.A. had stated that Mir had spoken with the children as well as with N.A. individually and that, after Mir had spoken with N.A., N.A. had told her what to say. Jeelani explained that A.A. had also told her that, when the supervisors were absent, Mir would whisper to the children what to say and would later "get[***] angry" when the children did not say what he had told them to. Jeelani also testified that A.A. had told her that Mir had directed the children to falsely state that Serrato had hit the boys with a belt, that A.A. and N.A. had both told her that Mir had promised to get them each a pet if they said the things that he told them to say, and that Ameena had informed her that Y.A. had relayed to her that Mir had threatened to take away Y.A.'s gaming system if he did not tell Jeelani what he had told him to say.

¶ 66        Furthermore, Jeelani and other witnesses also testified to certain nonverbal behaviors that the children had exhibited when they were in their presence. Jeelani testified that she had noticed

19

that two of the children would bite their nails and that another child would get migraines whenever they spoke with her. Jeelani also testified that Rodney had informed her that he had observed that Mir and N.A. had a "schtick or whatever you want to call it, when she's about to say something, she'll look at [Mir], make eye contact with [Mir], and then look over at the supervisor to make sure that the supervisor is there, and the supervisor is listening." Additionally, Jeelani testified that Discipio had informed her that, during a conversation that she once had with A.A. while Mir was present, A.A. would hesitate and look at Mir immediately after Discipio would ask A.A. a question. Although, as earlier noted, neither Discipio or Peckhart testified that they believed that Mir had coached the children, Discipio stated that she had observed A.A. repeatedly look at Mir for an answer whenever Discipio asked A.A. a question and Peckhart stated that she believed that the children sometimes used words and phrases that were inappropriate for their ages and sounded like they had come from an adult.

¶ 67      In addition to the available witness testimony, we again note from the record that, when the court removed the requirement that Mir's parenting time be supervised, the court did not express that it was doing so based on a finding that Mir had not coached the children. Nor does it appear that the court ever made such a finding, contrary to Mir's assertion otherwise. Based on this, as well as the available witness testimony, we find that it was not against the manifest weight of the evidence for the court to find in the judgment that Mir had coached the children.

¶ 68      Third, Mir argues that the court erred in its "wholesale adoption of [Drummond's] recommendations without addressing [Drummond's] qualifications, contingencies, and the evidentiary context in which those recommendations were made." Mir asserts that Drummond testified at trial that his recommendations would be different if Ameena continued to use corporal punishment to discipline the children, the children were denied their medical needs, or the children

20

were withheld from either party. Mir further asserts that Drummond also testified that there were "limitations" to his recommendations and that he had never contacted Mir's family to confirm that they did not want Mir to be awarded primary custody of the children. Mir argues that, by failing to consider the qualifications and limitations to Drummond's recommendations, the court "effectively substituted Drummond's] report for judicial fact-finding." He further argues that the court's failure in this regard is exacerbated by the fact that it also failed to "establish" which statutory factors it analyzed, or to explain its reasoning, in allocating parenting time.

¶ 69    Pursuant to section 602.7(a) of the Act, a court must allocate parenting time in accordance with the best interests of the child. 750 ILCS 5/602.7(a) (West 2022). In determining the child's best interests, the court must consider "all relevant factors," including 17 factors enumerated under the Act. *Id*. § 602.7(b). The court is not required to make explicit findings or to reference each of the relevant factors when allocating parenting time, and we presume that the court knew the law and followed it accordingly in deciding the proper allocation. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 42. A reviewing court will not disturb a circuit court's decision regarding parenting time unless the decision is against the manifest weight of the evidence. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45.

¶ 70    The record here shows that, in its judgment, the court listed many of the factors enumerated under section 602.7(a) of the Act and detailed the relevant facts and its findings as to each of those factors. The court also recounted the details of Drummond's recommendations, found that his testimony was "highly credible," and stated that, therefore, his recommendations had been given "great deference." Mir does not point to anything in the record that affirmatively shows that the circuit court failed to consider certain statutory factors or the qualifications and limitations to Drummond's recommendations in weighing the factors and allocating parenting time. Therefore,

we presume that the court properly considered all relevant evidence and statutory factors in deciding the proper allocation of parenting time and conclude that Mir's present argument is meritless. See *G.L.*, 2017 IL App (1st) 163171, ¶¶ 40, 44 (rejecting a party's argument that the circuit court failed to consider the applicable statutory factors because the court had explicitly set forth factors similar to those that it was required to consider, there was ample evidence related to the applicable factors in the record, and the party failed to affirmatively show that the court failed to consider the factors).

¶ 71                                     III. CONCLUSION

¶ 72          The judgment of the circuit court of Du Page County is affirmed.

¶ 73          Affirmed.